JOHNSTON, J., concurring.

HORTON, C. J., not sitting.

JOHN W. NUTE *et al*. v. THE AMERICAN GLUCOSE COMPANY.

1. PETITION IN ERROR—*Record—Bill of Exceptions*. The ruling of the court on an objection to the introduction of any testimony on the ground that the petition does not state facts sufficient to constitute a cause of action is a proceeding which it is the duty of the clerk to enter on the journal. The action of the court is thereby made a part of the record, and if exception is noted on the journal, may be reviewed in this court without the allowance of a bill of exceptions, or making a case for this court.

2. CONTRACT—*Cause of Action, Stated*. The petition and copy of contract thereto attached are too long to incorporate in the syllabus, and it is impracticable to summarize them. On consideration, this court finds that the petition states a cause of action under the contract, and that the trial court erred in sustaining an objection to the introduction of any testimony thereunder.

15—55 KAS.

*Error from Leavenworth District Court.*

THE plaintiffs in error brought suit to recover damages under a contract for the sale of what is termed "sugar-meal feed," to be produced at the defendant's factory in Leavenworth. When the case was called, after impaneling a jury, an objection was made to the introduction of any testimony, on the ground that the petition does not state a cause of action This objection was sustained by the court, the jury discharged, and a judgment rendered in favor of the defendant for costs. Attached to the plaintiff's petition is a copy of the contract sued on, which reads as follows :

"This agreement, made this 9th day of October, A. D. 1889, by and between the American Glucose Company, a corporation existing under and by virtue of the laws of the state of New Jersey, and having its principal office at Buffalo, N. Y., party of the first part, and The Sugar-Meal Company, a partnership consisting of John W. Nute, L. E. Wicks, and P. Thompson, partners doing business under the firm-name of 'The Sugar-Meal Company, at Kansas City, Mo.,' party of the second part, witnesseth : That the party of the first part agrees to furnish to the party of the second part the entire quantity of sugar-meal feed produced by its factory at Leavenworth, Kas., from the morning of October 10, A. D. 1889, to the morning of April 1, A. D. 1890, the said sugar-meal feed to be of the same character as that usually produced at the said factory, and to receive therefor from the party of the second part seventeen and one-half ($17\frac{1}{2}$) cents per barrel of two hundred (200) pounds in full payment for same. The party of the first part agrees to dispose of any part of the said feed which the party of the second part is obligated to take or pay for hereunder but which it may be unable to dispose of, without cost to the said party of the second part ; such feed to be run into the sewer

or otherwise destroyed by the party of the first part; but any feed in excess of the quantity which the party of the second part is obligated to take or pay for hereunder, and which it shall not take or pay for, may be disposed of by the party of the first part for its own use and account in any market not covered by or not in any way interfering with the arrangements of the party of the second part for the sale of such feed. The party of the first part agrees to load all cars for the party of the second part, and to deliver the same at any railroad in the city of Leavenworth, Kas., as has been customary heretofore; to ship the feed and make out bills of lading as it may be directed by the party of the second part, mail duplicate bills of lading to any address given by the party of the second part, and to attach original bills of lading to its drafts upon the party of the second part for the value of the feed contained in the cars for which such drafts are made. The party of the first part agrees to furnish a man to sell and deliver feed at its said factory to the retail trade in Leavenworth during the life of this contract. The party of the first part agrees to give the party of the second part the preference over all other competitors for its entire production of sugar-meal for the year from April 1, 1890, at equal prices and terms.

"The party of the second part agrees to take the entire production of sugar-meal feed of the said factory of the party of the first part, from October 10, A. D. 1889, to April 1, 1890, but not exceeding three thousand barrels of two hundred pounds each; that is to say, all the feed produced from twenty-two thousand five hundred bushels of corn, in any one week, and to pay for the same seventeen and one-half ($17\frac{1}{2}$) cents per barrel of two hundred pounds, delivered on cars at Leavenworth, Kas., and to furnish the party of the first part with all requisite shipping directions for same. The party of the second part agrees to honor all drafts made upon it by the party of the first part for feed shipped for account and by the direction of the party of the second part, when presented at its

office in Kansas City, Mo., with original bills of lading for the feed covered by such drafts, and also for any part of the feed which it is obligated to take weekly under this contract but which it shall not have instructed the party of the first part to ship, and which shall not have been furnished it for its retail trade by said party of the first part. The party of the second part agrees that, in the event of the party of the first part making drafts upon other parties by direction of the party of the second part, then the party of the second part will bear all expenses of collecting the same, and that it will pay the drafts of the party of the first part for the amount of any such drafts dishonored, upon presentation with such dishonored drafts attached, and that the party of the first part shall not be in any way responsible to it for the failure of other parties to honor such drafts, nor for the failure of banks or other parties to whom drafts may be sent for collection to collect and turn over to the party of the first part the proceeds of such draft. The party of the second part agrees to pay the party of first part the sum of thirty (30) dollars per month for the services of the man furnished by the party of the first part to sell and deliver feed to the retail trade in Leavenworth, the same to be paid at the end of each month. The party of the second part agrees to assume all the outstanding retail tickets for feed sold by the party of the first part prior to the taking effect of this agreement, but not exceeding twelve hundred (1,200) barrels in quantity, for the sum of twenty (20) cents per barrel of two hundred pounds. The party of the second part further agrees to furnish the party of the first part a good and sufficient bond in the sum of two thousand (2,000) dollars for the full and faithful performance of its obligation under this contract, such bond to be approved by and acceptable to the party of the first part.

"It is mutually understood by and between the parties hereto that a barrel of feed is intended to represent and contain such portion of the residuum from seven and one-half ($7\frac{1}{2}$) bushels of corn ground in the

said factory of the party of the first part, as it has been customary for the party of the first part to sell to its retail trade and out-of-town customers as its sugar-meal feed, and that the party of the first part shall receive, and the party of the second part shall pay, seventeen and one-half cents for such portion of the residuum from each seven and one-half bushels of corn ground by the said factory of the party of the first part, but not exceeding twenty-two thousand five hundred bushels of corn in any one week, unless the party of the second part shall receive in such week the feed product of more than twenty-two thousand five hundred bushels of corn, which, until the exact rate of production shall be established, as hereinafter provided, shall be deemed to be one barrel of feed for each seven and one-half bushels of corn ground.

" Settlements shall be made as follows : The party of the first part shall draw sight drafts with bills of lading attached upon the party of the second part or parties designated by it, for each day's shipments of feed by the party of the first part for account of the party of the second part. These drafts shall be credited to the account of the parties of the second part upon the books of the party of the first part. All moneys received from retail sales of the party of the second part at Leavenworth shall be turned over to the party of the first part by the agent or employee of the party of the second part, and shall also be credited to the party of the second part, together with all other moneys received by the party of the first part for account of the party of the second part from all other sources whatsoever. There shall also be credited to the party of the second part twenty cents for each barrel of feed delivered by it on tickets previously sold by the party of the first part and assumed by the party of the second part, as hereinbefore provided. There shall also be charged to the account of the party of the second part all expenses incurred in the collection of drafts, and also any draft returned dishonored. There shall be charged to the account of the party of the second part, as it is shipped, and at seventeen

and a half cents per barrel of two hundred pounds, the number of barrels of feed shipped for the account of the party of the second part. There shall also be charged, at seventeen and a half cents per barrel of two hundred pounds, all feed delivered on retail sales at Leavenworth of the parties of the second part, and all feed delivered on tickets of the party of the first part, assumed by the party of the second part as hereinbefore provided. There shall also be charged to the party of the second part at the end of each week, at $17\frac{1}{2}$ cents each, a sufficient number of barrels of feed to bring the total quantity charged for such week up to 3,000 barrels: *Provided, however*, That the total quantity so charged shall in no week exceed one barrel for each $7\frac{1}{2}$ bushels of corn ground in the said factory of the party of the first part during such week. Statements of each week's transactions, showing the balance due to the other party, shall be rendered to the party of the second part by the party of the first part as soon after the end of such week as practicable, and the balance, if any, due to the party of the first part shall be paid within three days after rendering of such statement, by check of the party of the second part, and if not so paid, the party of the first part shall have the right to make drafts for the amount upon the party of the second part. If the balance shall be shown to be due the party of the second part, it shall be deducted from the first draft thereafter made by the party of the first part upon the party of the second part. At the end of each month in which the party of the second part shall take all the feed produced at Leavenworth by the party of the first part, it shall be ascertained what number of bushels of corn produced each barrel of 200 pounds of feed produced in such month by the party of the first part. If it shall be ascertained that less than $7\frac{1}{2}$ bushels of corn produced such barrel of feed, the difference shall be made good by the party of the first part to the party of the second part on all feed charged the party of the second part since the previous test was made. If all the feed charged the

party of the second part has been paid for according to the terms of this agreement, then such difference shall be made good by check of the party of the first part to the party of the second part. If any feed charged the party of the second part shall not have been paid for, then this difference or so much of it as may be equal to the amount due from the party of the second part to the party of the first part shall be credited to the party of the second part, and the remainder, if any, shall be paid to the party of the second part by check of the party of the first part. If it shall be ascertained that a greater number of bushels of corn than 7½ was required to produce such barrel of feed, then the difference shall be made good to the party of the first part by check of the party of the second part.

"It is understood that delivery of the feed covered by this contract is to be made upon cars at Leavenworth, Kas., or at its factory, as directed by the party of the second part, and that in estimating the quantity of feed shipped, the weights of the railroad company over which it is shipped shall be taken, and for the amount of corn ground in its factory and the quantity of feed delivered to retail trade, the books and records of the party of the first part shall be deemed conclusive. Although the phrase 'barrel of feed' is used in this contract, it is understood that the feed is sold and bought and is to be delivered and paid for by weight, at the rate of seventeen and a half cents for each two hundred pounds.

"The party of the second part shall have the right, at any time, to furnish a man to attend to its retail trade and to any other of its interests at and around the said factory of the party of the first part; and, upon its giving the party of the first part notice of its desire so to do, the party of the first part shall be released from furnishing, and the party of the second from paying for, the services of the party previously furnished by the party of the first part for such service.

"It is further mutually agreed that in case of the suspension of the manufacture of feed, in whole or in

part in the factory of the party of the first part, by reason of fire or explosion or accident of any kind in the said works, or the machinery contained therein, the party of the first part shall not be liable in damages to the party of the second part for failure to deliver feed during such suspension of the production of feed.   It is further mutually agreed that the party of the second part shall have the right to extend this agreement to the 1st day of June, 1890, or to the 1st of July, 1890, by giving written notice thereof to the party of the first part on or before March 1st, 1889.''

The petition alleges that the defendant furnished 33,890 barrels of sugar-meal feed under the contract, and that on or about the 15th day of January, 1890, it closed its works at Leavenworth, and failed and refused to furnish any feed thereafter, and that such failure was not occasioned by fire, explosion, or accident.   It is alleged that the plaintiffs entered into the contract for the feed for the purpose of reselling it, and that they expended a large sum of money in establishing agencies and building up a trade, which was well known to the defendant; and that they made a net profit of 15 cents per barrel.   They ask judgment for $8,537.98 damages.

*Lucien Baker, Elijah Robinson,* and *Stuart Carkener,* for plaintiffs in error.

*J. H. Atwood,* and *L. B. & S. E. Wheat,* for defendant in error.

The opinion of the court was delivered by

Allen, J. :   A motion is made to dismiss the petition in error on various grounds, none of which, however, are tenable.   We find the petition in error sufficient, and while the clerk's certificate contains some things that are unnecessary, it is not defective.

It is also insisted that the only error complained of is
in sustaining an objection to testimony, and, as there
is no bill of exceptions in the case, that the error has
not been made to appear of record.    An objection to
the introduction of any testimony on the ground that
the petition does not state facts sufficient to constitute
a cause of action, raises only an issue of law.  ( *Water-
Supply Co. v. Dodge City*, ante, p. 60 ; 39 Pac. Rep. 219.)
It was held in the case cited that no motion for a new
trial was needed for the purpose of reviewing the
ruling of the court on such an objection.    Rulings of
the court on issues of law are properly entered on the
journal, as was done in this case, and no bill of
exceptions is necessary.    Section 705 of the code
provides :  '' On the journal shall be entered the pro-
ceedings of the court each day, and all orders of the
judge in vacation or at chambers, and also
all judgments entered on confession or de-
fault.''    Very clearly a ruling of the court
on such an objection, which completely
disposes of the case and ends the trial, is a proceed-
ing that is required to be entered on the journal.

1. Petition
in error—
record—bill
of exceptions.

The main question in this case is whether the de-
fendant company was bound to operate its factory at
Leavenworth from October 10, 1889, to April 1, 1890,
unless prevented by fire, explosion, or accident.
Many authorities are cited, and many general rules
are quoted on the subject of the construction of con-
tracts.    It would be a tedious and bootless task to
enter into an extended consideration of the many rules
to which our attention is called, which it is claimed
should be observed in determining the effect of this
contract.    All of them amount to but little more than
the proposition that it is the duty of the court to as-
certain, from the language made use of by the parties,

what their agreement really was, and give it effect according to their mutual intentions. We do not think it necessary, either, to discuss at length the question as to how far oral evidence might be introduced for the purpose of establishing a cause of action under the plaintiffs' petition. Generally speaking, the only purpose of such testimony, as an aid to the construction of a contract, is to afford the court information concerning the subject-matter of the contract and the situation of the parties, so that it may view the instrument in the light of such knowledge as the parties themselves had of surrounding circumstances. Such evidence is not to be received, however, for the purpose of supplying defects or omissions in the contract where there is no claim made that it does not truly embody the agreement of the parties. In this case the plaintiffs rely on the written agreement as the foundation of their cause of action. They must stand or fall by its terms. For the defendant it is contended that the contract is drawn with great care and attention to detail; that nothing is to be inferred that is not expressed; that where the parties have carefully considered the agreement into which they have entered, have selected the terms used after careful consideration, have minutely provided for many contingencies, that no room is left for implication, and no presumptions should be indulged in which will have the effect of imposing on either party a burden which he has not expressly assumed. It is said that nowhere in the contract can there be found an express agreement by the defendant to operate its factory during the time covered by the contract; that the defendant contracted to sell no more sugar-meal feed than should be produced in its Leavenworth factory; that the only limitation with reference to quan-

tity is that of 3,000 barrels per week, more than which quantity the plaintiff was under no obligation to take, but that the defendant was not bound to produce 3,000 barrels per week, nor any other quantity; that it appears that corn-meal feed was but a by-product of minor importance in its factory, a barrel being the amount produced from 7½ bushels of corn, for which, under the contract, the plaintiffs were to pay but 17½ cents; that it cannot be presumed that the defendant would have obligated itself to continue to operate its factory merely for the purpose of complying with its contract for this comparatively insignificant product. It must be conceded that there is much force in this reasoning. To the trial court it appeared convincing. We are not, however, satisfied with it. The defendant was operating a factory at Leavenworth. This contract is for a very definite period, from the morning of one day to the morning of another day named. The only hint of a possible stoppage or suspension of the factory is that contained in the following paragraph:

"In case of the suspension of the manufacture of feed, in whole or in part in the factory of the party of the first part, by reason of fire or explosion or accident of any kind in the said works, or the machinery contained therein, the party of the first part shall not be liable in damages to the party of the second part for failure to deliver feed during such suspension of the production of feed."

If it were not intended to bind the defendant to operate its factory, or to produce feed, this section would seem to be entirely meaningless. To break the force of the inference naturally arising from this provision, it is ingeniously argued by counsel that this provision was not made for the purpose of exempting the defendant from liability for failure to produce

feed, but to relieve it from the necessity of delivering feed which had been theretofore manufactured. We are impressed rather with the ingenuity of the argument than with its force. We do not think that the word "deliver" is to be singled out as the one on which the whole meaning of the paragraph turns, but that the fair and reasonable interpretation of the clause is that, if the defendant was prevented from manufacturing feed by fire, explosion, or accident, the plaintiffs should not recover damages because the defendant was prevented by such misfortune from complying with its contract. The contract, in its general scope, does not contemplate the production and storage by the defendant of the feed, but rather that it shall be promptly disposed of, and the necessity for so doing is recognized by that provision of the contract under which the defendant agrees to run into the sewer or otherwise destroy whatever the plaintiffs should be unable to use. By the terms of the contract, as construed by the defendant, if no feed was produced, the defendant was not bound to deliver. Its obligation to deliver depended entirely on production. It is provided in the contract that the defendant shall furnish a man to sell and deliver feed at its factory to the retail trade in Leavenworth "during the life of this contract," and that the plaintiffs shall pay him $30 per month. The plaintiff assumed all outstanding retail tickets issued by the defendant, not exceeding 1,200 barrels. Can it be said that the defendant was under no obligations to produce even this? Provision was carefully made for shipments, for drafts on consignees, and for monthly settlements. Beyond all question, the plaintiffs were obligated to take and pay for 3,000 barrels per week, if so much was produced, whether they succeeded in

selling the same to customers, or allowed the defend-
ant to run it into the sewer. Beyond that quantity,
they were privileged to take whatever the factory pro-
duced, but were not bound to do so. It is evident
from the terms of the contract that it would be neces-
sary for the plaintiffs to incur expense, and to make
needed arrangements for the sale of this product. The
provisions with reference to the quantity shows that
the parties did not contemplate that the whole prod-
uct could be advantageously disposed of. The de-
fendant was assured, however, of a market for 3,000
barrels per week. Is it possible that the plaintiffs
were not assured of any supply whatever, and that,
after having incurred any amount of expense that
might be necessary in finding a market for the prod-
uct, it was entirely optional with the defendant
whether it would operate its factory at all or not?
At the time the contract was entered into, the de-
fendant was operating its factory, and continued to so
operate it until about the middle of January following.
If it was bound to operate it one week, it was bound
to operate it the full time. But it is said that a prod-
uct of one barrel per day would have been a full
compliance with the contract, and that even if it be
conceded that an obligation rested on the defendant
to operate its factory, still that substantial damages
cannot be awarded because the defendant was not
bound to more than a nominal compliance with the
contract. On the other hand, the plaintiffs claim that
they are entitled to have their damages assessed on
the basis of 3,000 barrels per week ; that if the defend-
ant had operated its factory, they were bound to take
so much, and had the privilege of taking more if pro-
duced ; that the measure of their damages ought to
be the amount they could have been compelled to pay

Nute v. Glucose Co.

for. The contract will not bear this interpretation. It is perfectly clear that the defendant was not bound to produce 3,000 barrels per week. We think the defendant was bound, however, to operate its factory in good faith; that the contract clearly contemplated that it should do so. If it had so operated, it would have produced a substantial quantity of feed. How much would have been so produced, we are in no position to determine. Such a factory, however, cannot be operated in good faith and in a reasonable manner without incurring great expense and making a corresponding output. It would be folly to operate a large establishment merely for the purpose of making a nominal product. On the other hand, it is clear that the defendant did not bind itself to make the largest possible output. We think the plaintiffs are entitled to recover such damages as they are able to show resulted to them from the failure of the defendant to operate its factory in a reasonable manner, but that such damages should be computed on the least quantity that would have been produced in case the factory had been operated in good faith. The court erred in sustaining the objection to any testimony.

2. Contract—cause of action, stated.

The judgment is reversed, and the case remanded for further proceedings in accordance with the views above expressed.

All the Justices concurring.